The first case is 10 minutes. The last three are 30 minutes inside. I'm sorry, 20 minutes. And we're going to stick strictly to the schedule today. If any of you want to save time for rebuttal, you can tell us in advance, but you're going to be responsible for your own time and keeping track. And if you use your rebuttal time during your direct opening arguments, that will be it. So we'll move along with the first case, Sanko v. Ashcroft. Good morning, Your Honors. May it please the court. My name is Carol Edward, and it's my pleasure today to represent Ms. Sanko and her husband, Mr. Alassan Abba. They are also present today in court. We are here. I'm here back in front of the court again on an appeal of another one of Judge Warren's cases. This one is regarding an asylum matter. The facts of the case basically are that we have two politically active Gambian couples from families that were active within the country of Gambia, both before and after a coup occurred in 1994. Prior to the coup, Ms. Sanko's father was a minister in the government, equivalent to a cabinet member, and she was very active in the political party and worked for the government herself. Her husband was not present at the time of the coup, but had traveled to the United States. And testimony was presented that his brother was involved in – his brother, who was a personal bodyguard for the president, the prior president before the coup,  and people involved were executed. The issues today on this case – I know the court's all aware of the requirements of asylum, so I'm not going to go through those in detail, but the issues really are twofold. They have to do with credibility, and they have to do with what's persecution. We have a situation where Ms. Sanko testified at the hearing about a rape. And there's two questions – did the rape happen or did the rape not happen? If the rape happened, case law supports her entitlement to persecution, given all the other factors surrounding her case, her family's political involvement. If the rape didn't happen, then she still may be entitled to asylum. But there's a view here that I think is important to present, not because I realize that the judge is entitled to make a decision, and it's not your place to say I would have made a different decision than he would have, but that's what he did and we can support it. But it's important to consider it in context of the entire hearing and what happened and how the people who were testifying were treated. The rape was supposedly revealed at the time of the asylum hearing. That's what my client said, her husband said, an interpreter said. But there was no question asked about it. But there is a question about whether the asylum officer heard it. Clearly he didn't. He said, I didn't hear her say rape. But there was some language in which she said that she was insulted and embarrassed, which could have easily been assaulted and embarrassed. There's a number of things that could have been addressed, that could have been discussed, that could have led to further information and discussion about it, which weren't. If you follow the immigration judge and the Board of Immigration Appeals, and you discount her testimony and you say, we're going to say that the judge had sufficient evidence to deny that this rape occurred or to find that it didn't occur, there's still sufficient evidence to grant her asylum based upon the two arrests. And she was arrested twice, detained both times. She witnessed her father being beaten during the first arrest and she was very frightened. And those facts, if you find them credible under our case law, are sufficient to establish persecution. There's a second part of this case. And the second part of the case has to do with the husband, Alessandro Ba. Mr. Ba testified that his brother had been a bodyguard and that his brother was present during a bloody countercoup where, again, people who partook of that and were caught were summarily executed. Even the judge noted that in the hearing. And the profile report provided by the asylum office and the State said that if he was, if a family member was to return who had been involved in that countercoup, they would be at serious risk. So the question then becomes, was there fact sufficient to support the finding that his brother was actually involved in this countercoup? Because if he was, then he's established a well-founded fear of persecution. The problem is that when the attorney attempted to call the brother as a witness to get additional information, the judge essentially browbeat her into not calling this witness, who was a very critical witness and said that she needed to make an offer of proof as to his testimony. Which she did, but which was later discounted as was the testimony of my client. And that his failure to allow that testimony would and could have made all of the difference in this case because if the brother had testified consistent with what the, one of the applicants testified, Mr. Ba testified, then he would have been entitled to asylum and he would have established the case. And then as a result of one party winning in these asylum cases, the whole family wins. So that failure to allow that testimony of that witness was a critical error in this case. Is your clock working? That clock is not working. Oh, neither is mine. I get extra time. Okay. Okay. Well, okay. No, no, I'm fine. So this case is, in my opinion, is relatively straightforward. There's been, there is, and I'm sure that the service will say that there was lots of conflicts and confusion in the testimony, whether this happened or that happened. Many of those things are things that could have been cleared up. They can be explained. There, they aren't what the BIA relied on in making its decision. The BIA relied principally on Mr., in denying the asylum application to put forward by Mr. Ba, they said his testimony is inconsistent with his brother's and this letter doesn't make sense to us in conjunction with what you're saying. And therefore, we're going to deny the case. In terms of the wife, again, they said, we don't believe the rape because it wasn't revealed properly and there's this confusion about it. And, and we don't think that being in jail twice, and we don't think that witnessing your father being beaten up in jail is sufficient to establish persecution. And I will save my remaining time for rebuttal. Thank you, Kathy. Good morning, Your Honor. Terry Skadron, representing the Respondent, John Ashcroft. This case involves two petitioners who destroyed their credibility before the agency by trying to embellish their story to win a grant of asylum to Gambia. Obviously, both petitioners would prefer to remain in the United States. However, as the Board reasonably found, and that is the decision before the Court on this petition for review, neither established past persecution or a well-founded fear of future persecution through credible evidence. I'd like to focus on the wife's claim because that really was the lead claim in this case. And her claim, I would agree with the petitioner, the rape claim was central to her case. Certainly, had she established a rape that occurred for political reasons, that would be sufficient, that level of harm would rise to the level of persecution and be sufficient to establish her claim. However, the Board reasonably found on this record that the rape was a later embellishment to beef up her asylum claim after she lost before the agency. There's a wealth of evidence in the record supporting that determination. I'll quickly overview that. In the first instance, her testimony with regard to the rape at the asylum hearing was not detailed as the petitioner asserts in her brief. It was extremely vague. Her testimony was limited to her assertion that some of the soldiers in her house, they raped me. There were no details. There was no indication how many soldiers were involved, whether anyone else was present in the family compound at the time. It was simply a bare assertion. There was no mention of the rape in her asylum application. That's a material omission from the application. And as the parties have focused in their briefing, there was no mention of the rape in her interview with the asylum officer. Now, when that was called to her attention at the hearing, the petitioner gave shifting explanations. She first insisted, well, she first stated that she had not mentioned the rape to the asylum officer because he did not ask for it, ask about it. And had she stuck with that explanation, perhaps this case could come within the court's Paramusami decision, which the petitioners counseled 28-J to the court yesterday. In that case, there was a petitioner who claimed a sexual assault, but she had not mentioned it at her airport inspection interview, and later, according to this court, credibly testified that her omission was due to embarrassment, you know, the cultural matter of not mentioning something of that nature to a male airport inspector. But here, Sanko, while initially claiming that she did not tell the officer about the rape, then shifted her story when the immigration judge pointed out that the officer would have had no reason to question her about the rape because it was missing from her application. Then she shifted her story and insisted for the remainder of the hearing that, yes, indeed, she had mentioned the rape. Her husband, who was present, interjected himself at that point in the proceeding and seeing that there was some problems arising in his wife's rape claim, told the immigration judge, well, he was present during the interview, and he clearly heard her tell the officer that she had been raped. His explanation for why it was not in the asylum officer's notes or his report was, well, perhaps it was inaccurately interpreted. When the immigration judge pointed out, well, Mr. Baugh, you were present, you were fluent both in English and in Ms. Sanko's Gambian dialect, why wouldn't you call that to the officer's attention if it was inaccurately translated? His response was, I don't know. I don't know how to explain it. Not only the adverse credibility determination here rested, though, not only on the petitioner's testimony but also on the testimony of the asylum officer, as well as his report and his notes, which were introduced into evidence. The officer testified unequivocally that the rape would have been, so to speak, a red flag to him. It is something he certainly would have considered significant in evaluating his claim, and it is something that he would not have failed to mention in his notes. There's no suggestion that the officer had any bias against the petitioner. He volunteered that perhaps Ms. Sanko had not mentioned it to him because she was embarrassed. I mean, a paramissami type of explanation. Of course, when he volunteered that explanation on the petitioner's behalf, he was unaware that Ms. Sanko was insisting that she had indeed mentioned the rape. I have a question for you, if I may. These interviews with the asylum officer, they're not taped? No, Your Honor, they're not. Why is that? Why isn't there a simple cassette tape running during these interviews so that if some dispute arises, there's a record of it, or if the officer doesn't recall something, they can go back and listen to a tape? Well, Your Honor, I would certainly agree that if there were tapes or transcriptions of these interviews. I'm not saying transcription as a matter of course, and I'm not saying it's required. I'm just curious because I know in some other administrative law judge type systems, it's routine to have tapes of hearings. Now, here we're talking about an asylum officer at a level before the IJ. I'm just, since the whole focus of this argument from Ms. Edwards and you seems to be, you know, what did she say to the asylum officer, and did he not hear this as his notes reflect, or could he have missed it, or could it have been misinterpreted? It's like the whole thing seems unnecessary in a procedural sense to me. I'm just wondering why, as a matter of course, the INS doesn't have cassettes that could clarify these things. Your Honor, I can't answer that on behalf of the agency. I certainly agree it would eliminate these types of debates in federal court as to what transpired. Well, even more, it might ensure that people who are entitled to be in the United States and not sent back with the risk of their lives would get a fair hearing. Don't worry about saving the judge's time. Worry about whether the government is treating people fairly. Well, Your Honor, the test, the board's test is that set forth at INRAE-SS, and that is whether there was a sufficiently reliable record of what transpired at the interview. Yes, that's right. And even taking that test, which I happen to agree with Judge Gould, that's not the test I would adopt, and I would hope that now that we have this wonderful expedited process for handling these cases, that maybe the Justice Department would reconsider and do what Judge Gould suggests and take these hearings and eliminate these problems. But you do have a case, SS, which says that you could either tape it or the officer should write down the questions and answers or give an adequate some kind of summary report. As I read the questioning of the officer, nobody asked him whether he did that in this case. They asked what his general practice was. Nobody said, what kind of notes do you have in this case? He described what he does generally. He says, I have access and basically I write down the questions that I ask in response. It may not always be every single word that's said. Next question, how many interviews did you take on this date? But nobody said to him, what kind of notes do you have in this case? He did testify that he had reviewed his notes in the case. Yes. I would also submit, though, to the Court that this is a classic Vermont Yankees type of scenario where the Court might prefer different procedures at the agency level. No, I'm not preferring anything. I'm applying the agency's test. It's not a classic anything. It's a question of whether the evidence that you produced as to what his notes were in this case meet the agency's test. It was not the credibility assessment here I'd like to underscore is not simply based on his notes, as was the case in the In Re SS case. And that was all that was before the Board were the asylum officer's notes unexplained by his testimony, unsupported by any kind of detailed report such as what was offered here. I would ask the Court to look at the full record here, including Sanko's testimony, her husband's testimony, the asylum officer's testimony, the lack of any reference to the rape in the asylum application itself. Going across, if you look at the record as a whole, I don't see how the Court could not conclude that substantial evidence supports this adverse credibility determination. Thank you. Thank you, Your Honor. There's a couple of things that I wanted to add. And one of them is that at the time the Respondent's brief was submitted, they said that we didn't address the issue on the offer of proof to the BIA. But we did, in fact, and there's two parts of our brief where we specifically discussed the offer of proof. So I wanted to point that out to the Court. And those were at page 10 and 17 of the BIA brief that we submitted. Also, in terms of the due process issue regarding the offer of proof, the BIA, of course, cannot consider constitutional issues. So failure to brief those issues, if we hadn't even discussed it, wouldn't preclude this Court from considering that issue. Is there any precedent anywhere that says that the lack of a tape of the asylum interview lends any credence, you know, or gives any inference to the petitioner? Because I haven't seen any. I'm a little troubled by this whole process. But, I mean, I think there is, as the government argues, you know, a certain amount of evidence in the record to support the determination made. I just really wish there was a different procedure so that we wouldn't have to be uncertain about what was said. But is there any case that says... There's no cases other than the... Nothing that I know in the circuit... Any case that says that the fact that the INS doesn't tape these asylum officer interviews can yield some inference to a petitioner? I will. I do not know of such a case, but I will look for a case when I return to my office and submit a 28G brief if I find one. Okay. But the only case that really talks about the BIA is the case that Judge Reinhardt has discussed, which is the... Which would give the choice. There has to be a tape or notes, right, or some report. Right. And it gives a range of those, that range that can satisfy the process. And it would beheave the government to tape these. They certainly have the opportunity. They have videotaping capabilities. They do tape other interviews on other cases that are done administratively before they go to the court. But they haven't made that effort to do that. Even without videotapes, it gets a little more complicated to set up. But cassette tapes are used at a lot of administrative agency hearings and then not transcribed except when there's a problem. Okay. Well, that's all I have at the moment. The test is... The choices they give them are a handwritten account of the specific questions asked and his specific responses, which could be signed by the applicant as an accurate summary. Alternatively, a suitable record could be produced through transcription of an electronic recording. At a minimum, the record must contain a meaningful, clear and reliable summary of the statements made by the applicant at the interview. The board needs to know what transpired in the proceedings before the asylum officer, before we can evaluate questions with respect to credibility arising from the interview. Do you think that the record made in this case meets any of those tests? No, I don't. There are, I'm sure this court's seen other immigration court records where there are questions and answers asked and they're signed. And it's routinely done in cases where people are arrested and questioned by investigators. They do a question and answer. They sign on the bottom of the page. You know they read it. They saw it. And it's also more complicated because we have an interpreter here. So the applicant doesn't know if the interpreter answered or interpreted what she had to say accurately. And that's a big problem. And if there was a tape of the proceeding, we would be able to. I assume the question is whether the record contains a meaningful, clear and reliable summary of the statements made by the applicant at the interview. I don't think it is. It meets that requirement because not of all the things that she said are down there. It is what he thought he heard her say that he that he felt was pertinent were listed. It's not what she wrote down. It's not what she said. It's his summary. And one other thing about this case is that this what is the final officer was what is in the record? Is it is it just his testimony over the telephone or is there some written record of his interview? There is a written record of notes that he wrote at the time of the interview. And that was also submitted to the record. And is it do you think is it your contention that those notes don't comply with this requirement that the that there be a meaningful, clear and reliable summary of the statements? I don't think it complies because when there was an interpreter used and he was writing it down, we don't know if he covered everything she said. If she had an opportunity to review it to make sure that it had said what she thought she had represented to him, I think it would be adequate. If she signed the bottom of it saying, yeah, that's what I said, I think it would be adequate. But she had no opportunity to review that. She had no idea what it said. In fact, she thought it would reveal the rape. And that's why she when the judge gave her an opportunity to talk to the asylum officer, she's the attorney said, based upon what my client's saying, she's sure she told him it should be in there. She couldn't really. I mean, how could she review it if she was using an interpreter? She didn't really have to be read back and reinterpreted. Yeah, it would double the time of the process. It would have or they could have stepped outside. Is there any case that says that is required to satisfy the reliable record requirement? There are other cases in other areas of law, not immigration law, that talk about statements of individuals and questions and answers and the reliability of them being based on the person having a meaningful opportunity to review them and sign them. Yes, there are. And I don't have those in front of me, but I would also be happy to provide those to the court. Given that, given the translation issue, I'm not sure it would mean very much. Did she, in fact, sign at the bottom of these notes? No, she did not. But I continue to be troubled by her two different statements as to why it's not in the notes. Number one, he didn't ask. And number two, I told him. The first one being he didn't ask him, so I didn't tell him. The second one being I did tell him, but he didn't write it down properly. There's another way to interpret that. And that is and with that would make it consistent. And that is he didn't ask. They didn't say he didn't ask details, but he didn't ask details about the rape. And if she had revealed the rape to him and then he didn't ask details about it, then certainly she wouldn't have gone into it any further. She would have just revealed it. And that would be a consistent interpretation of both statements that she made. Remember, we've got a person who's speaking a second language. And there was supposed to be an interpreter there. But the interpreter who came to the hearing spoke at the immigration court, spoke the wrong dialect. So they dismissed the interpreter and decided to proceed in English as best they could because they had the wrong interpreter. And, of course, they didn't want to continue the case and set it aside for another day. The person came from out of state and they spoke the wrong dialect. So it was a big problem. All right. Thank you, counsel. Thank you. This case will be submitted. And I will submit the additional citations as requested. Appreciate it. Next case on the calendar is.
judges: Reinhardt, W Fletcher, Gould